T.C. Memo. 2001-317

UNITED STATES TAX COURT

HERBERT L. WHITEHEAD AND JENNIFER L. WHITEHEAD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6271-00.                    Filed December 20, 2001.

<u>J. Patrick Quinn</u>, for petitioners.

<u>Julie L. Payne</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-
ciencies in, and accuracy-related penalties under section
6662(a)[1] on, petitioners' Federal income tax:

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code (Code) in effect for the years at
issue.  All Rule references are to the Tax Court Rules of Prac-
tice and Procedure.

| Year | Deficiency | Accuracy-Related Penalty |
|------|-----------|--------------------------|
| 1996 | [1]$15,672 | $3,134.40 |
| 1997 | [1]15,832 | 3,166.40 |

[1]The deficiency determined by respondent for each year included a deficiency of $120 in Federal excise tax under sec. 4973(a).

The issues remaining for decision[2] are:

(1) Do payments during each year at issue by Burien Nissan, Inc. (Burien Nissan), to Kenneth Stanford (Mr. Stanford) constitute constructive dividends to petitioner Herbert L. Whitehead (Mr. Whitehead) for each such year? We hold that they do.

(2) Should the determinations in the notice of deficiency (notice) to increase petitioners' income for each year at issue with respect to their respective uses of certain Burien Nissan automobiles during each such year be sustained? We hold that they should.

(3) Are petitioners entitled to a deduction for each year at issue for mortgage interest and property taxes relating to certain real property located in Kirkland, Washington? We hold that they are not.

(4) Are petitioners entitled to a deduction for 1996 for certain contributions to an individual retirement account (IRA) in the name of petitioner Jennifer L. Whitehead (Ms. Whitehead) in excess of the amount conceded by respondent? We hold that

[2]Certain computational issues for the years at issue also remain, resolution of which flows automatically from our resolution of the issues that we address herein.

they are not.

(5)  Are petitioners liable for each year at issue for the excise tax under section 4973(a) for excess IRA contributions? We hold that Ms. Whitehead is.

(6)  Are petitioners liable for each year at issue for the accuracy-related penalty under section 6662(a)?  We hold that they are.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found except as stated herein.

Petitioners, who at all relevant times were husband and wife, resided in Sumner, Washington, at the time the petition was filed.

Petitioners have three children, who were born in April 1993, June 1996, and July 2000, respectively.

### Burien Nissan

At all relevant times, Burien Nissan, a corporation organized in the State of Washington, operated an automobile dealership located in Burien, Washington.  At least during the years at issue, Mr. Whitehead was president of Burien Nissan.  During each year at issue, Burien Nissan had current earnings and profits of at least $24,000.

Ownership of Burien Nissan Stock

As of May 24, 1990, Burien Nissan had 120,000 shares of common stock (Burien Nissan stock) issued and outstanding. As of that date, Donald Johnston (Mr. Johnston) and Jacque Johnston (Jacque Johnston) owned 96,000 shares of that stock (the Johnston shares),[3] and Gary McLaughlin (Mr. McLaughlin) owned 24,000 shares of that stock (the McLaughlin shares).

On May 25, 1990, Mr. Johnston, Jacque Johnston, and Mr. McLaughlin entered into a stock purchase agreement (May 25, 1990 stock purchase agreement) with Mr. Stanford, Mr. Whitehead, Patrick Watson (Mr. Watson), Gerald Buchner (Mr. Buchner), and Burien Nissan. Mr. McLaughlin, as executive manager of Burien Nissan,[4] signed that agreement on its behalf.

Pursuant to the May 25, 1990 stock purchase agreement, Mr. Johnston and Jacque Johnston agreed to sell 34,800 of the Johnston shares to Mr. Stanford, Mr. Whitehead, Mr. Watson, and Mr. Buchner (the buyers) for $121,326.53, Mr. McLaughlin agreed

---

[3]The parties stipulated that Mr. Johnston owned 96,000 shares of Burien Nissan stock as of May 24, 1990. That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). The record establishes, and we have found, that both Mr. Johnston and Jacque Johnston owned 96,000 shares of Burien Nissan stock as of May 24, 1990.

[4]The record does not disclose the duties and the responsibilities of the executive manager of Burien Nissan at all relevant times.

to sell all of the McLaughlin shares (i.e., 24,000 shares) to the buyers for $83,673.47, and the buyers purchased those 58,800 shares of Burien Nissan stock as follows:

| Buyer | Number of Shares Purchased |
|-------|----------------------------|
| Mr. Stanford | 35,280 |
| Mr. Whitehead | 11,760 |
| Mr. Watson | 5,880 |
| Mr. Buchner | 5,880 |

Pursuant to the May 25, 1990 stock purchase agreement, as of May 25, 1990, the individuals shown below owned the following number of shares of Burien Nissan stock, evidenced by the following Burien Nissan stock certificates,[5] which represented the percentage of stock ownership in that company indicated below:

| Stockholder | Number of Shares Owned | Stock Certificate Number | Percentage Ownership |
|-------------|------------------------|--------------------------|----------------------|
| Mr. Johnston and Jacque Johnston[1] | 61,200 | 8 | 51.0 |
| Mr. Stanford | 35,280 | 4 | 29.4 |
| Mr. Whitehead | 11,760 | 5 | 9.8 |
| Mr. Watson | 5,880 | 6 | 4.9 |
| Mr. Buchner | 5,880 | 7 | 4.9 |

[1]The parties stipulated that Mr. Johnston owned 61,200 shares of Burien Nissan stock as of May 25, 1990. That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). The record establishes, and we have found, that both Mr. Johnston and Jacque Johnston owned 61,200 shares of Burien Nissan stock as of May 25, 1990.

(We shall refer to any individual who owned Burien Nissan stock

---

[5]Although the purchase and sale of Burien Nissan stock pursuant to the May 25, 1990 stock purchase agreement was effected as of May 25, 1990, it was not until Aug. 31, 1990, that Burien Nissan issued the stock certificates evidencing such stock ownership as of May 25, 1990.

as of May 25, 1990, or at any other time as stockholder.)

Pursuant to the May 25, 1990 stock purchase agreement, Burien Nissan acquired an option to purchase over a 30-month period that began in June 1990 the 61,200 Johnston shares (the 61,200 remaining Johnston shares) that Mr. Johnston and Jacque Johnston continued to own after that agreement was effected. The purchase price for the 61,200 remaining Johnston shares under that option was $215,000. The May 25, 1990 stock purchase agreement required the stock certificate evidencing the 61,200 remaining Johnston shares of Burien Nissan stock to bear a legend (legend) indicating that those 61,200 shares were subject to Burien Nissan's option to purchase set forth in that agreement.

The May 25, 1990 stock purchase agreement provided that none of the individuals who acquired Burien Nissan stock pursuant to that agreement (i.e., Mr. Stanford, Mr. Whitehead, Mr. Watson, and Mr. Buchner) was to "sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to" any of the Burien Nissan stock owned by him without the prior written consent of Mr. Johnston and Jacque Johnston. That agreement required the stock certificates evidencing the Burien Nissan stock owned by Mr. Stanford, Mr. Whitehead, Mr. Watson, and Mr. Buchner, respectively, to bear a legend indicating that the sale or other disposition, or the granting of an option with respect to, such stock required the prior written consent of Mr. Johnston

and Jacque Johnston as set forth in that agreement.

Attached to and made part of the May 25, 1990 stock purchase agreement were an employment agreement between Burien Nissan and Mr. Stanford pursuant to which Burien Nissan agreed to employ Mr. Stanford as its president and an employment agreement between Burien Nissan and Mr. Whitehead pursuant to which Burien Nissan agreed to employ Mr. Whitehead as its general sales manager. The employment agreement between Burien Nissan and Mr. Stanford provided, inter alia, certain benefits to Mr. Stanford as president of that company, including unrestricted access to two Burien Nissan automobiles for Mr. Stanford's personal use.

On September 1, 1990, Burien Nissan and the stockholders[6] entered into an agreement (September 1, 1990 stockholders' agreement), the stated purpose of which was as follows:

> The Shareholders desire to promote their mutual interests and the interests of the Corporation [Burien Nissan] by imposing certain restrictions and obligations on each other, on the Shares which they presently own, and on any additional shares which they or their successors or transferees may hereafter acquire or which the Corporation may hereafter issue. * * *

The September 1, 1990 stockholders' agreement set forth, inter alia, certain restrictions on the disposition (i.e., sale, transfer, pledge, encumbrance, or disposal by operation of law or otherwise) of Burien Nissan stock held by each of the minority

---

[6]The number of shares and the percentage ownership of Burien Nissan stock owned by each stockholder did not change between May 25, 1990, and Sept. 1, 1990.

stockholders (i.e., Mr. Stanford, Mr. Whitehead, Mr. Watson, and Mr. Buchner).[7]

With respect to any disposition of Burien Nissan stock by any minority stockholder, the September 1, 1990 stockholders' agreement incorporated by reference the provision in the May 25, 1990 stock purchase agreement which stated that no minority stockholder was to "sell, assign, transfer, exchange, or other- wise dispose of, or grant any option with respect to" any Burien Nissan stock owned by him without the prior written consent of Mr. Johnston and Jacque Johnston.

With respect to any disposition of Burien Nissan stock by a minority stockholder to a third party, in addition to the forego- ing restriction requiring the prior written consent of Mr. Johnston and Jacque Johnston, the September 1, 1990 stockholders' agreement did not permit any minority stockholder to sell less than all of his Burien Nissan stock to a third party. That agreement permitted a minority stockholder to sell all of his

---

[7]The September 1, 1990 stockholders' agreement also set forth certain restrictions on the transfer by Mr. Johnston and Jacque Johnston of the 61,200 remaining Johnston shares of Burien Nissan stock. That agreement precluded Mr. Johnston and Jacque Johnston from voluntarily transferring any of the 61,200 remain- ing Johnston shares unless any such transfer was: (1) To a member or members of their immediate family for estate planning purposes or (2) with the prior written consent of Mr. Stanford. The September 1, 1990 stockholders' agreement further provided that any transfer by Mr. Johnston and Jacque Johnston of the 61,200 remaining Johnston shares was to be subject to Burien Nissan's option to purchase those shares as set forth in the May 25, 1990 stock purchase agreement.

Burien Nissan stock to a third party only if he first offered such stock to the other minority stockholders, who had a right of first refusal to purchase such stock in proportion to their stock ownership in Burien Nissan.

In the event of a violation of any of the foregoing restrictions on the disposition of Burien Nissan stock, the September 1, 1990 stockholders' agreement provided:

> Any attempt to transfer Shares in violation of this Agreement, or any involuntary or other purported transfer other than as provided in this Agreement, shall be void.  If any Shares or transfer documents are presented to the Corporation to effect such attempted transfer, the Shareholder who owns such Shares shall immediately be deemed to be Terminated * * * and such Termination shall trigger the purchase rights of the other Shareholder[s] set forth in Section 3. * * *

The purchase rights set forth in Section 3 of the September 1, 1990 stockholders' agreement that were triggered upon a violation by a minority stockholder of any of the restrictions set forth in that agreement regarding the disposition by a minority stockholder of such stockholder's Burien Nissan stock were that Burien Nissan, the other minority stockholders, and Mr. Johnston and Jacque Johnston, in that order, had a right of first refusal to purchase all of the stock of a terminated minority stockholder.

The September 1, 1990 stockholders' agreement further required that the restrictions set forth in that agreement be reflected in an endorsement (endorsement) to appear on all Burien

Nissan stock certificates.  That endorsement stated:

> The shares of stock represented by this certificate are subject to the terms of a Shareholders' Agreement dated as of September 1, 1990, which restricts or limits their transfer and limits the rights of the shareholder.  A copy of the Agreement is on file at the office of the registered agent of the Corporation.

Burien Nissan experienced financial difficulties during 1990 and early 1991.  On a date during 1991 not disclosed by the record, Mr. Stanford accepted an offer to manage a large automobile dealership in Hawaii.  On September 13, 1991, Mr. Whitehead and Mr. Stanford entered into a stock purchase agreement (September 13, 1991 Whitehead/Stanford stock purchase agreement), pursuant to which Mr. Whitehead purchased on that date for $178,000 all 35,280 shares of Mr. Stanford's Burien Nissan stock.  That agreement provided that Mr. Whitehead was to pay the purchase price of $178,000 by delivering to Mr. Stanford a nonnegotiable promissory note.

In the September 13, 1991 Whitehead/Stanford stock purchase agreement, Mr. Stanford represented and warranted to Mr. Whitehead the following:

> a.    Stanford is the owner and registered holder of the Stanford Shares and holds the Stanford Shares free and clear of all liens, claims or encumbrances and subject to no options, warrants, contracts or agreements of any kind other than * * * [the May 25, 1990 stock purchase agreement] and * * * [the September 1, 1990 stockholders' agreement].
>
> b.    Neither the execution and delivery of the Agreement by Stanford nor the consummation of the transactions contemplated herein, nor compliance with

the terms and provisions hereof, will result in the creation or imposition of any lien, charge or encumbrance upon any of the Stanford Shares, or conflict in any way with the provisions of, or constitute a default under, or require the consent of any other party to, any loan agreement, indenture, mortgage, deed of trust, agreement, or other instrument to which Stanford or the Company is a party or by which it may be bound.

c. Neither the execution of this Agreement nor consummation of the sale of the Stanford Shares requires the approval or consent of any governmental authority having any jurisdiction over the Company's business or of any party to any agreement with the Company or Stanford, other than such consents as have been previously obtained.

On September 13, 1991, Mr. Whitehead signed a promissory note (promissory note), pursuant to which he agreed to pay Mr. Stanford the principal amount of $178,000, plus interest in accordance with that note, in exchange for Mr. Stanford's 35,280 shares of Burien Nissan stock. The promissory note provided that no principal payments were to be made under the note until the so-called option closing date, which was the date on which Burien Nissan completed its purchase pursuant to the option set forth in the May 25, 1990 stock purchase agreement of the 61,200 remaining Johnston shares of Burien Nissan stock. The promissory note further provided: (1) On a date that was three years after the option closing date, interest on the unpaid principal balance of the note was to begin to accrue, and (2) on a date that was eight years after the option closing date, the entire principal balance under the note was due and payable in full.

On a date not disclosed by the record, the sale on September

13, 1991, of Mr. Stanford's 35,280 shares of Burien Nissan stock to Mr. Whitehead was recorded in Burien Nissan's stock register. On September 13, 1991, Burien Nissan issued stock certificate 9 in the name of Mr. Whitehead, which evidenced his ownership of the 35,280 shares of Burien Nissan stock that he purchased from Mr. Stanford on that date.

On December 13, 1993, Burien Nissan, Mr. Johnston, Mr. McLaughlin, Mr. Whitehead, and Mr. Watson signed an addendum to the May 25, 1990 stock purchase agreement (addendum to the May 25, 1990 stock purchase agreement). Mr. Whitehead, as president of Burien Nissan, signed that addendum on its behalf.

The addendum to the May 25, 1990 stock purchase agreement was executed "for the purpose of ratifying prior acts of the Shareholders and to approve the taking of certain acts in the future." That addendum provided, inter alia:

> 1.1 Stanford has abandoned and assigned the entirety of his interest to Whitehead.
>
> 1.2 The stock held by Buchner in the amount of 5,880 shares shall be redeemed by the Company [Burien Nissan] for Thirty thousand DOLLARS ($30,000).[1]
>
> 1.3 The net result of the above changes in stock ownership is the following:

| SHAREHOLDER | SHARES |
|---|---|
| Don Johnston[2] | 61,200 |
| Herbert Whitehead | 47,040 |
| Patrick Watson | 5,880 |
| | -------- |
| Total | 114,120 |
| | ======== |

[1]At a time not disclosed by the record, Mr. Buchner was involved in an employment dispute with Burien Nissan.  That dispute was resolved on or about Jan. 10, 1994.  Pursuant to the resolution of the employment dispute between Mr. Buchner and Burien Nissan, on or about Jan. 12, 1994, Burien Nissan redeemed Mr. Buchner's 5,880 shares of Burien Nissan stock for $10,217.

[2]Although not altogether clear from the record, it appears that Jacque Johnston's ownership interest in the 61,200 remaining Johnston shares was transferred to Mr. Johnston on a date not disclosed by the record.

The addendum to the May 25, 1990 stock purchase agreement further provided, inter alia, that Burien Nissan was to redeem the 61,200 remaining Johnston shares for $434,677 and that Burien Nissan was to make that payment, as well as certain other payments, on January 3, 1994.  Pursuant to that addendum, on January 12, 1994, Burien Nissan canceled Mr. Buchner's 5,880 shares of stock as well as the 61,200 remaining Johnston shares.

As a result of the addendum to the May 25, 1990 stock purchase agreement, as of January 12, 1994, the ownership of Burien Nissan stock was as follows:

| Stockholder | Number of Shares Owned |
|---|---|
| Mr. Whitehead | 47,040 |
| Mr. Watson | 5,880 |

On April 11, 1995, Burien Nissan began making monthly payments to Mr. Stanford in the amount of $2,000, which monthly payments continued until at least September 1999.

On October 15, 1995, Burien Nissan canceled the 35,280 shares of Mr. Whitehead's stock that Mr. Whitehead had purchased from Mr. Stanford on September 13, 1991. Thereafter, Mr. Whitehead owned 11,760 shares of Burien Nissan stock.

On March 10, 1996, Burien Nissan and Mr. Whitehead entered into an agreement entitled "ASSIGNMENT AND ASSUMPTION OF AGREEMENT AND PROMISSORY NOTE" (assignment and assumption agreement). Mr. Whitehead signed the assignment and assumption agreement as president of Burien Nissan on its behalf as the assignee and in his individual capacity as the assignor. Mr. Stanford consented to and signed the assignment and assumption agreement. The assignment and assumption agreement acknowledged (1) the purchase on September 13, 1991, by Mr. Whitehead of all of Mr. Stanford's Burien Nissan stock pursuant to the September 13, 1991 Whitehead/Stanford stock purchase agreement and (2) Mr. Whitehead as the sole stockholder of Burien Nissan.[8]

The assignment and assumption agreement provided, inter alia, the following:

---

[8]It is not clear from the record when Mr. Watson ceased to own his 5,880 shares of Burien Nissan stock and Mr. Whitehead became the sole stockholder of Burien Nissan. Form 1120, U.S. Corporation Income Tax Return (Form 1120), that Burien Nissan filed for each of its tax years 1994 through 1997 showed Mr. Whitehead as the sole stockholder of Burien Nissan. Mr. Whitehead signed as president of Burien Nissan and under penalties of perjury at least Form 1120 that Burien Nissan filed for each of its tax years 1994 through 1996. It appears that Mr. Whitehead was the sole stockholder of Burien Nissan at least as of the end of 1994 and at all relevant times thereafter.

RECITALS

A.     Whitehead owns or controls one hundred per-cent (100%) of all the issued and outstanding stock of the corporation.

B.     Whitehead acquired his stock in the corpora-tion at various times and by various agreements, in-cluding that [1991 Whitehead/Stanford] Stock Purchase Agreement, with attached promissory note (hereinafter referred to as the "Agreement") entered into with Kenneth R. Stanford (hereinafter referred to as "Stan-ford") on September 13, 1991.   * * *

C.     The terms of the Agreement are incorporated herein by reference as though fully set forth.

D.     Whitehead wishes to assign his rights and responsibilities, as well as the benefits and burdens of the Agreement to the corporation.

E.     The corporation wishes to acquire the rights and responsibilities, as well as the burdens and bene-fits of the Agreement from Whitehead by means of this Assignment.

F.     Stanford is willing to consent to this As-signment.

NOW, THEREFORE, in consideration of the mutual representations, covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowl-edged, the corporation and Whitehead hereby agree as follows:

I.

Assignment and Assumptions

1.1  Assignment of Rights.  Whitehead hereby sells, assigns, and conveys to the corporation, and the corporation hereby purchases and assumes from Whitehead all of Whitehead's right, title and interest in the Agreement under the terms of the Agreement.

1.2  Assumption of Liabilities.  Also in consider-ation for the transfer of the Agreement, the corpora-

tion agrees to assume from the date of the execution of this Assignment forward Whitehead's obligations and liabilities under the terms of the Agreement.

1.3  Closing.  All actions, transfers, conveyances and indemnities called for herein shall be effective as of the date hereinabove first written [March 10, 1996].

\*     \*     \*     \*     \*     \*     \*

III.

Representations and Warranties of Whitehead

3.1  Good Title.  Whitehead represents and warrants to the corporation that there are no claims, liens or encumbrances which can lawfully be made against Whitehead with respect to the Agreement.

3.2  No Breach.  Whitehead represents and warrants that the execution, delivery and performance by it of the terms and provisions of the Agreement and this Assignment will not conflict with or result in the breach of any terms, conditions or provisions of the Agreement.

3.3  Consent.  Whitehead represents and warrants that, as evidenced by Sanford's signature herein below, Whitehead has obtained the consent of Stanford, a party to the Agreement.

3.4  Guarantee.  Whitehead agrees to guarantee that the corporation will perform under the terms of the Agreement, and indemnifies Stanford against default by the corporation under the terms of the Agreement.

On March 10, 1996, Mr. Whitehead, as president of Burien Nissan, signed a document on its behalf that was entitled "ACTION BY BOARD OF DIRECTORS OF BURIEN NISSAN, INC. BY UNANIMOUS WRITTEN CONSENT".  Pursuant to that document, the Board of Directors of Burien Nissan (which that document stated consisted only of Mr. Whitehead) consented to the assignment and assumption agreement.

At no time did Mr. Whitehead make any payments to Mr. Stanford on the promissory note that Mr. Whitehead signed on September 13, 1991, in exchange for Mr. Whitehead's purchase of all of Mr. Stanford's Burien Nissan stock. As discussed above, Burien Nissan continued to make monthly payments of $2,000 to Mr. Stanford from April 1995 until at least September 1999. Neither Mr. Whitehead nor Burien Nissan expected Mr. Whitehead to repay those amounts to Burien Nissan.

A document dated May 31, 1996, entitled "Burien Nissan, Inc. Adjusting Journal Entries for the period ended December 31, 1995",[9] showed, inter alia, the following entries (AJE 15 entries) under the heading "AJE 15":

| Account # | Account Name/Description | Debits | Credits |
|-----------|-------------------------|--------|---------|
| 3440 | Note Payable-Ken Stanford | | 178,000 |
| 3910 | Retained Earnings | 178,000 | |
| | To record note payable on capital stock redeemed | | |

Petitioners' Respective Uses of
Certain Burien Nissan Automobiles

During the years at issue, neither Mr. Whitehead nor Ms. Whitehead owned an automobile. During each of those years, each petitioner had the use of, and did use, certain automobiles owned by Burien Nissan (Burien Nissan automobiles). During the years at issue, petitioners did not pay Burien Nissan for their respective uses of certain Burien Nissan automobiles.

---

[9]The record does not disclose who prepared that document.

The specific Burien Nissan automobiles that each petitioner used during the years at issue varied throughout those years. Neither petitioners nor Burien Nissan maintained records showing which Burien Nissan automobiles each petitioner used during those years. During the years at issue, Burien Nissan paid part of the fuel and maintenance costs for those Burien Nissan automobiles, and petitioners paid part of those costs.

Mr. Whitehead selected the specific Burien Nissan automobiles that Ms. Whitehead and he, respectively, used during the years at issue. The average value of the new Burien Nissan automobiles that Ms. Whitehead used during 1996 was $24,000. The average value of the new and used Burien Nissan automobiles that Mr. Whitehead used during 1996 was $18,000.

Neither petitioners nor anyone else prepared or maintained any document that purported to show either the amount or the purpose of Ms. Whitehead's use of certain Burien Nissan automobiles during the years at issue.

Mortgage Interest and Property Taxes

During the years at issue, petitioners owned and resided on real property located at 2419 199th Avenue Court East, Sumner, Washington (Sumner property). During those years, Home Servicing of America (Home Servicing) held a mortgage loan on that property. During the years at issue, petitioners paid Home Servicing the following amounts for mortgage interest and property taxes

with respect to the Sumner property:

| Year | Mortgage Interest | Property Taxes |
|------|-------------------|----------------|
| 1996 | $28,070.66 | $5,302.88 |
| 1997 | 27,651.00 | 5,584.00 |

Prior to February 1994, Essie Whitehead, who is Mr. White-head's mother, owned and resided on real property located at 12619 Juanita Drive Northeast, Kirkland, Washington (Kirkland property). In February 1994, Essie Whitehead, who continued to reside at the Kirkland property, and Mr. Whitehead refinanced the mortgage loan on the Kirkland property and secured that refinanc-ing by that property.[10]

During the years at issue, Colonial Mortgage Co. (Colonial Mortgage) held the mortgage loan on the Kirkland property. During those years, Essie Whitehead and Mr. Whitehead were jointly liable on that mortgage loan. Sometime during the first week of each month throughout the years at issue, Essie Whitehead made the monthly mortgage loan payment on the Kirkland property, which included payment of mortgage interest and property taxes, from checks that she drew on her own checking account.

_____

[10]The parties stipulated that in February 1994 Essie White-head and both Mr. Whitehead and Ms. Whitehead refinanced the mortgage loan on the Kirkland property. That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195. The record establishes, and we have found, that in February 1994 Essie Whitehead and Mr. Whitehead, and not Ms. Whitehead, refinanced the mortgage loan on the Kirkland property.

On a date not disclosed by the record, Colonial Mortgage issued Form 1098, Mortgage Interest Statement (Form 1098), for 1996, to Essie Whitehead and Mr. Whitehead. The address for them shown on that form was the Kirkland property address. During 1996, mortgage interest and property taxes of $7,951.34 and $1,821.35, respectively, were paid with respect to the Kirkland property.[11]

During each month throughout 1996, except January, Ms. Whitehead signed and issued a check payable to Essie Whitehead that was drawn on petitioners' joint checking account with SeaFirst bank (petitioners' joint checking account). The total amount of those 11 checks was $6,600. None of those checks bore a notation as to their purpose. Essie Whitehead negotiated each of those checks.

During each month throughout 1997, except May, June, and November, Ms. Whitehead signed and issued a check payable to Essie Whitehead that was drawn on petitioners' joint checking account. In addition to the check so issued to Essie Whitehead during each of the months March and October 1997, Ms. Whitehead

---

[11]The parties stipulated that during 1997 petitioners paid mortgage interest and property taxes of $27,651 and $5,584, respectively, with respect to the Kirkland property. That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. See Cal-Maine Foods, Inc. v. Commissioner, supra. The record establishes, and we have found, that during 1997 petitioners paid mortgage interest and property taxes of $27,651 and $5,584, respectively, with respect to the Sumner property.

signed and issued to her an additional check for each of those months that was drawn on petitioners' joint checking account. The total amount of the 11 checks that Ms. Whitehead issued to Essie Whitehead during 1997 was $6,622. None of those checks bore a notation as to their purpose. Essie Whitehead negotiated each of those checks.

Petitioners' IRA Contributions

During each of the years at issue, petitioners contributed $2,000 to an IRA in the name of Mr. Whitehead and $2,000 to an IRA in the name of Ms. Whitehead. During those years, petitioners did not withdraw any funds from any IRA.

Petitioners' Federal Income Tax Returns

Petitioners jointly filed Form 1040, U.S. Individual Income Tax Return (joint return), for each of the years at issue. Norman Smith (Mr. Smith), petitioners' accountant, signed each of those returns as return preparer. In petitioners' joint return for each of the years at issue, petitioners reported Mr. White-head's occupation as "Executive" and Ms. Whitehead's occupation as "Hshld. Executive".

In petitioners' 1996 joint return, petitioners reported, inter alia, wage income attributable to Mr. Whitehead of $109,722[12] and "Other income" of $8,975.[13]

_____

[12]Petitioners attached to petitioners' 1996 joint return Form W-2, Wage and Tax Statement (Form W-2), for 1996 for Mr.
(continued...)

Petitioners' 1996 joint return included Schedule A, Itemized Deductions (Schedule A).  In that schedule, petitioners claimed, inter alia, the following deductions:  (1) $7,124 for real estate taxes, (2) $36,022 for mortgage interest,[14] and (3) $79 for points not reported in Form 1098.[15]

Petitioners' 1996 joint return also included Schedule SE. In that schedule, petitioners reported self-employment income attributable to Ms. Whitehead of $6,600.

In petitioners' 1996 joint return, petitioners claimed,

---

[12](...continued)
Whitehead (Mr. Whitehead's 1996 Form W-2).  That form showed "BURIEN NISSAN ADMINISTRATION" as employer and Mr. Whitehead as employee.  Mr. Whitehead's 1996 Form W-2 showed, inter alia, "Wages, tips, other compensation" in the amount of $109,721.77. That form indicated that that amount included a benefit of $1,800 that was identified in that form as "EPV".  Although not alto-gether clear, we believe "EPV" stands for "employer provided vehicle".

[13]Petitioners included in petitioners' 1996 joint return a statement in which petitioners provided certain information with respect to the "Other income" reported in that joint return.  In that statement, petitioners listed the following items as "Other income":  (1) Income of $1,625 from Bulldog Alarms, (2) income of $6,600 from Burien Nissan as shown in Schedule SE, Self-Employ-ment Tax (Schedule SE), that petitioners included in their 1996 joint return, and (3) income of $750 from Burien Nissan.

[14]Petitioners' 1996 joint return included a statement in which petitioners reported that $28,071 of the total mortgage interest deduction that they claimed was attributable to Home Servicing and $7,951 of that deduction was attributable to Colonial Mortgage.

[15]The $79 deduction claimed for points not reported in Form 1098 represented petitioners' amortization of points that they claim they paid with respect to the refinancing of the Kirkland property in February 1994.

inter alia, deductions for the respective $2,000 contributions made to Mr. Whitehead's IRA and to Ms. Whitehead's IRA.

In petitioners' 1997 joint return, petitioners reported, inter alia, wage income attributable to Mr. Whitehead of $120,537[16] and other income described as "Personal use of company vehicle" of $6,600 as shown in Schedule SE that petitioners included in their 1997 joint return.

Petitioners' 1997 joint return included Schedule A. In that schedule, petitioners claimed, inter alia, the following deductions: (1) $7,422 for real estate taxes, (2) $35,504 for mortgage interest, and (3) $79 for points not reported in Form 1098.[17]

Petitioners' 1997 joint return also included Schedule SE. In that schedule, petitioners reported self-employment income attributable to Mr. Whitehead of $6,600. Petitioners' 1997 joint return included a statement in which petitioners described that

---

[16]Petitioners attached to petitioners' 1997 joint return Form W-2 for 1997 for Mr. Whitehead (Mr. Whitehead's 1997 Form W-2). That form showed "BURIEN NISSAN ADMINISTRATION" as employer and Mr. Whitehead as employee. Mr. Whitehead's 1997 Form W-2 showed, inter alia, "Wages, tips, other compensation" in the amount of $120,537.03. That form indicated that that amount included a benefit of $1,800 that was identified in that form as "EPV". As discussed supra note 12, we believe "EPV" stands for "employer provided vehicle".

[17]The $79 deduction claimed for points not reported in Form 1098 represented petitioners' amortization of points that they claim they paid with respect to the refinancing of the Kirkland property in February 1994.

income as income from "Personal use of company vehicle".

In petitioners' 1997 joint return, petitioners claimed, inter alia, deductions for the respective $2,000 contributions made to Mr. Whitehead's IRA and to Ms. Whitehead's IRA.

Notice of Deficiency

In the notice issued to petitioners for the years at issue, respondent determined, inter alia, to increase petitioners' taxable income for each year at issue by $24,000. Respondent made those determinations because respondent determined that Mr. Whitehead received from Burien Nissan constructive dividends of $24,000 during each such year.

Respondent further determined to increase petitioners' taxable income for each year at issue in an amount equal to the aggregate value of petitioners' respective uses of certain Burien Nissan automobiles.[18] Respondent made those determinations

_____

[18]Respondent determined that the aggregate value of petitioners' respective uses of certain Burien Nissan automobiles during each year at issue was $15,000. With respect to petitioners' tax year 1996, respondent credited petitioners for the following items of income reported in their 1996 joint return: (1) $1,800 of wage income identified as "EPV" in Mr. Whitehead's 1996 Form W-2, (2) $750 of other income from Burien Nissan, and (3) $6,600 of alleged self-employment income from Burien Nissan, which respondent determined was not self-employment income. Respondent's crediting of the foregoing items of income reported in petitioners' 1996 joint return resulted in a determination in the notice to increase petitioners' taxable income for 1996 in the net amount of $5,850. With respect to petitioners' tax year 1997, respondent credited petitioners for the following items of income reported in their 1997 joint return: (1) $1,800 of wage income identified as "EPV" in Mr. Whitehead's 1997 Form W-2 and
(continued...)

because respondent determined that petitioners did not provide adequate records or other documentation to substantiate any business use of certain Burien Nissan automobiles during each such year. In this connection, respondent also determined that petitioners did not have any self-employment income during each of the years at issue. Respondent made those determinations because respondent determined that the aggregate value of petitioners' respective uses of certain Burien Nissan automobiles during each of those years must be reported as employee income attributable to Mr. Whitehead and that no part of that value may be reported, as petitioners had claimed in their joint return for each of the years at issue, as self-employment income attributable to Ms. Whitehead for 1996 and to Mr. Whitehead for 1997.

Respondent also determined to disallow the deductions claimed by petitioners for each of the years at issue for mortgage interest and property taxes in excess of the amounts deducted by them with respect to the Sumner property. Respondent further determined to disallow the deduction claimed by petitioners for each of the years at issue for points not reported in Form 1098.

---

[18](...continued)
(2) $6,600 of alleged self-employment income from "Personal use of company vehicle", which respondent determined was not self-employment income. Respondent's crediting of the foregoing items of income reported in petitioners' 1997 joint return resulted in a determination in the notice to increase petitioners' taxable income for 1997 in the net amount of $6,600.

Respondent also determined to disallow the deduction that petitioners claimed in their 1996 joint return for the $2,000 contribution made to Ms. Whitehead's IRA during that year. Respondent made that determination because respondent determined that Ms. Whitehead did not receive any compensation during 1996. Respondent further determined that petitioners are liable for each of the years at issue for an excise tax of $120 under section 4973(a) for excess IRA contributions.

Respondent also determined that petitioners are liable for each of the years at issue for the accuracy-related penalty under section 6662(a).

OPINION

Petitioners bear the burden of proving that the determinations in the notice are erroneous.[19]  See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  With respect to the deduc-

---

[19]With respect to court proceedings arising in connection with examinations commencing after July 22, 1998, under sec. 7491(a) the burden of proof shifts to respondent in specified circumstances.  Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.  The record in this case does not establish the date on which the examination of petitioners' taxable years at issue began, and neither party contends that sec. 7491(a) applies here.

With respect to court proceedings arising in connection with examinations commencing after July 22, 1998, under sec. 7491(c) respondent bears the burden of production with respect to any individual's liability for any penalty or addition to tax.  <u>Id.</u> As noted above, the record in this case does not establish the date on which the examination of petitioners' taxable years at issue began.  Moreover, neither party contends that sec. 7491(c) applies here.

tions claimed by petitioners, deductions are strictly a matter of legislative grace, and petitioners bear the burden of proving that they are entitled to any deductions claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

The Court's Evaluation of Evidence in
the Record on Which Petitioners Rely

Petitioners rely on certain testimonial and documentary evidence to support their positions with respect to the various issues in this case.

Testimonial Evidence

At trial, petitioners called themselves, Mr. Smith, and Essie Whitehead as witnesses.  With respect to the testimony of petitioners, based on our observation of each petitioner at trial, including our observation of each petitioner's demeanor, we did not find either of them to be credible.  We also found Mr. Whitehead's testimony to be conclusory and/or uncorroborated by reliable evidence in certain material respects.  While we found Ms. Whitehead's testimony to be specific in certain respects, we found her testimony about certain material matters to be general, vague, and/or conclusory.

With respect to Mr. Smith's testimony,[20] based on our obser-

---

[20]Although petitioners do not explicitly rely on brief on the testimony of Mr. Smith, the individual who prepared petitioners' joint returns for the years at issue, at trial they relied on his testimony to support their respective positions with respect to certain of the issues in this case.

vation of Mr. Smith at trial, including our observation of his demeanor, we did not find him to be credible.  We also found his testimony to be conclusory in certain material respects and irrelevant in certain other material respects.

With respect to the testimony of Essie Whitehead, we found her testimony to be inconsistent with certain of the parties' stipulations of fact in this case.

Documentary Evidence

The record contains a number of documents on which petitioners rely to establish their positions with respect to the issues that remain in this case.  With respect to the constructive dividend issue, petitioners rely on, inter alia, copies of three Burien Nissan stock certificates, i.e., stock certificates 4, 6, and 9, which we found to be incomplete and questionable in certain material respects.  We found those copies to be incomplete in that there was no legend and no endorsement on the back side of each of them, as required by the May 25, 1990 stock purchase agreement and the September 1, 1990 stockholders' agreement, respectively.  We found the copies of the three Burien Nissan stock certificates in question to be questionable in that the back side of the copy of stock certificate 9 was completely blank,[21] and the back side of each of the two copies of stock

[21]It appears that the back side of stock certificate 9 may not have been copied.

certificates 4 and 6 reflected purported assignments of the stock to which each such certificate pertained that contained what we consider on the record before us to be significant irregularities.[22]  We shall not rely on the copies of Burien Nissan stock certificates 4, 6, and 9 that we found to be incomplete and questionable in certain material respects.

With respect to the constructive dividend issue, petitioners also rely on, inter alia, the following AJE 15 entries in a document entitled "Burien Nissan, Inc. Adjusting Journal Entries for the period ended December 31, 1995":

| Account # | Account Name/Description | Debits | Credits |
|-----------|-------------------------|--------|---------|
| 3440 | Note Payable-Ken Stanford | | 178,000 |
| 3910 | Retained Earnings | 178,000 | |
| | To record note payable on capital stock redeemed | | |

Petitioners rely on the foregoing AJE 15 entries to show that Burien Nissan redeemed Mr. Stanford's stock in 1995.[23]  We are not persuaded by the AJE 15 entries that Burien Nissan redeemed Mr. Stanford's stock in 1995, or at any other time.  We have found that Mr. Whitehead purchased all of Mr. Stanford's Burien Nissan stock on September 13, 1991, pursuant to the September 13,

_____

[22]By way of illustration, each purported assignment that appeared on the back side of each of the two copies of stock certificates 4 and 6 contained (1) no signature in the space provided for a witness to sign and (2) a date that we found to be inconsistent with credible evidence in the record.

[23]Petitioners do not contend that Burien Nissan redeemed any stock from Mr. Whitehead in 1995.

1991 Whitehead/Stanford stock purchase agreement. We find on the record before us that Mr. Stanford owned no Burien Nissan stock after September 13, 1991, and that Burien Nissan could not have redeemed any stock from Mr. Stanford in 1995. We shall not rely on the AJE 15 entries to support petitioners' position that Burien Nissan redeemed Mr. Stanford's Burien Nissan stock in 1995.

With respect to the issue of Mr. Whitehead's use of certain Burien Nissan automobiles during the years at issue, petitioners rely on, inter alia, a document entitled "AUTOMOBILE MILEAGE AND EXPENSE LOG" (purported mileage log). Petitioners contend that Mr. Whitehead maintained that purported mileage log during January, February, and March 1996 in order to determine what portion of his use of certain Burien Nissan automobiles during the years at issue constituted a business use of those automobiles. Based upon our examination of the purported mileage log, we found it to be questionable. That purported log contained different handwriting and certain numerical entries which appeared to have been altered.[24] We shall not rely on the purported mileage log.

Burien Nissan's Payments to Mr. Stanford

Respondent determined to increase petitioners' taxable

---

[24]We also found certain numerical entries contained in the purported mileage log to be illegible.

income for each year at issue by $24,000. Respondent made those determinations because respondent determined that Mr. Whitehead received from Burien Nissan constructive dividends of $24,000 during each such year. With respect to those determinations, respondent contends that under cases such as Yelencsics v. Commissioner, 74 T.C. 1513 (1980), Burien Nissan's $2,000 monthly payments to Mr. Stanford during the years at issue constitute constructive dividends to Mr. Whitehead for those years. That is because, according to respondent, by making those payments Burien Nissan relieved Mr. Whitehead of his obligations under the promissory note that he issued to Mr. Stanford on September 13, 1991. Petitioners contend that the September 13, 1991 Whitehead/Stanford stock purchase agreement pursuant to which Mr. Whitehead purchased Mr. Stanford's Burien Nissan stock was void or voidable because of the restrictions placed on the transfer of such stock pursuant to the September 1, 1990 stockholders' agreement. Consequently, according to petitioners, Mr. Whitehead did not purchase Mr. Stanford's Burien Nissan stock, and Burien Nissan's payments to Mr. Stanford during the years at issue represented payments to Mr. Stanford in redemption of his Burien Nissan stock.

Both the May 25, 1990 stock purchase agreement[25] and the

---

[25]Although petitioners do not rely on the May 25, 1990 stock purchase agreement, that agreement required the prior written

(continued...)

September 1, 1990 stockholders' agreement placed certain restrictions on the transfer of Burien Nissan stock. Under the terms of those agreements, the only restriction that applied to the sale of all of the shares of one minority stockholder to another stockholder was the restriction that required the selling minority stockholder to obtain the prior written consent of Mr. Johnston and Jacque Johnston.[26] Pursuant to the terms of the September 13, 1991 Whitehead/Stanford stock purchase agreement, certain consents had been obtained prior to the execution of that agreement, and that agreement did not require any other consents to be obtained.

On the record before us, we find that petitioners have failed to show that the "consents * * * previously obtained" referenced in the September 13, 1991 Whitehead/Stanford stock purchase agreement were not the consents of Mr. Johnston and Jacque Johnston. On that record, we further find that petitioners have failed to show that the sale of Mr. Stanford's Burien Nissan stock to Mr. Whitehead pursuant to the September 13, 1991

---

[25](...continued)
consent of Mr. Johnston and Jacque Johnston to any transfer of Burien Nissan stock by a minority stockholder. The foregoing restriction in the May 25, 1990 stock purchase agreement was incorporated by reference into the September 1, 1990 stockholders' agreement.

[26]The September 1, 1990 stockholders' agreement placed additional restrictions on the sale of Burien Nissan stock by a minority stockholder to a third party.

Whitehead/Stanford stock purchase agreement was effected without the prior written consent of Mr. Johnston and Jacque Johnston, which, under the May 25, 1990 stock purchase agreement and the September 1, 1990 stockholders' agreement, was the only restriction to which that sale was subject.[27] Based on our examination of the entire record before us, we find that petitioners have failed to establish that the September 13, 1991 Whitehead/ Stanford stock purchase agreement was void or voidable.[28]

We have rejected the only argument that petitioners advance (i.e., that the September 13, 1991 Whitehead/Stanford stock purchase agreement was void or voidable) to establish error in the determinations of respondent that Mr. Whitehead received constructive dividends totaling $24,000 during each year at issue

---

[27]The May 25, 1990 stock purchase agreement and the September 1, 1990 stockholders' agreement provided that the only restriction that applied to the sale of all of the shares of one minority stockholder to another stockholder was the restriction that required the selling minority stockholder to obtain the prior written consent of Mr. Johnston and Jacque Johnston. Petitioners have pointed to no other restriction that would apply to the sale by Mr. Stanford to Mr. Whitehead of Mr. Stanford's Burien Nissan stock that was effected by the September 13, 1991 Whitehead/Stanford stock purchase agreement, and we have found none.

[28]Assuming arguendo that petitioners had established that the September 13, 1991 Whitehead/Stanford stock purchase agreement was void or voidable, on the record before us, we find that Mr. Whitehead's Sept. 13, 1991 purchase of Mr. Stanford's shares of Burien Nissan stock was recognized and ratified by Burien Nissan, Mr. Johnston, Mr. McLaughlin, Mr. Whitehead, and Mr. Watson pursuant to the addendum to the May 25, 1990 stock purchase agreement that was executed on Dec. 13, 1993.

as a result of Burien Nissan's payments to Mr. Stanford during
each such year.  On the instant record, we sustain those determi-
nations.

Petitioners' Respective Uses of Certain Burien Nissan Automobiles

Respondent determined to increase petitioners' taxable
income for 1996 and 1997 in the net amounts of $5,850 and $6,600,
respectively, as a result of petitioners' respective uses during
those years of certain Burien Nissan automobiles.  Respondent
made those determinations because respondent determined that
petitioners did not provide adequate records or other documenta-
tion to substantiate any business use of those automobiles during
each year at issue.  Respondent further determined that petition-
ers' respective uses of certain Burien Nissan automobiles during
the years at issue resulted in employee income attributable to
Mr. Whitehead for those years and did not result in self-employ-
ment income attributable to Ms. Whitehead for 1996 or to Mr.
Whitehead for 1997.[29]  Petitioners advance a number of conten-
tions with respect to respondent's determinations regarding their

---

[29]The parties agree that petitioners reported the value of
their respective uses of certain Burien Nissan automobiles in
petitioners' 1996 joint return as follows:  Wage income of $1,800
attributable to Mr. Whitehead, "Other income" of $750, and "Other
income" of $6,600 attributable to Ms. Whitehead and subject to
self-employment tax.  The parties further agree that petitioners
reported the value of their respective uses of certain Burien
Nissan automobiles in petitioners' 1997 joint return as follows:
Wage income attributable to Mr. Whitehead of $1,800 and "Other
income" of $6,600 attributable to Mr. Whitehead and subject to
self-employment tax.

respective uses of certain Burien Nissan automobiles during the years at issue.[30]  Before turning to each of those contentions, we shall summarize the pertinent law.

In general, gross income includes compensation for services. Sec. 61(a)(1).  When services are paid for in property or in exchange for other services, the fair market value of such property or other services must be included in income as compen-

---

[30]In petitioners' answering brief, petitioners contend that respondent takes a new position on brief with respect to both petitioners' respective uses of certain Burien Nissan automobiles during the years at issue and the value of such uses (respondent's position on brief).  With respect to respondent's position on brief regarding petitioners' respective uses of certain Burien Nissan automobiles during the years at issue, petitioners contend:  "In its Brief, respondent now takes the completely new position that none of the use of the vehicles used by the petitioners was business related."  We disagree.  Respondent's position on brief regarding petitioners' respective uses of certain Burien Nissan automobiles during the years at issue is the same as respondent's position in the notice, i.e., (1) petitioners did not provide adequate records or other documentation to substantiate any business use of those automobiles during those years; and (2) petitioners did not show that Ms. Whitehead's use of certain Burien Nissan automobiles during the years at issue constituted compensation to her by Burien Nissan for certain services that she performed during those years.  With respect to respondent's position on brief regarding the value of petitioners' respective uses of certain Burien Nissan automobiles during the years at issue, petitioners contend:  "Respondent then proceeds to use some assumptions to compute what it feels should be taxable income to the petitioners."  Respondent's position on brief regarding the value of petitioners' respective uses of certain Burien Nissan automobiles during the years at issue is the same as respondent's position in the notice, i.e., the aggregate value of petitioners' respective uses of those automobiles during each year at issue was $15,000.  See supra note 18. On the record before us, we find that respondent's position on brief does not differ from respondent's determinations in the notice or respondent's position at trial.  We find on that record that respondent's position on brief is not a new position.

sation.  Sec. 1.61-2(d)(1), Income Tax Regs.  Such property or other services may take the form of fringe benefits, which include, inter alia, employer-provided automobiles.  Sec. 1.61-21(a)(1), Income Tax Regs.  In the case of compensation paid in the form of a fringe benefit, an employee[31] must include in gross income the amount by which the fair market value of the fringe benefit exceeds the sum of the amount, if any, paid for the benefit and the amount, if any, specifically excluded from gross income by, inter alia, section 132.  Sec. 1.61-21(b)(1), Income Tax Regs.

#### Petitioners' Position With Respect to Mr. Whitehead's Use of Certain Burien Nissan Automobiles During the Years at Issue

Petitioners contend that, in calculating the value of Mr. Whitehead's use of certain Burien Nissan automobiles during the

---

[31]The person to whom a fringe benefit is taxable may not be an employee of the provider of the fringe benefit, but may be, for example, a director or an independent contractor.  Sec. 1.61-21(a)(4)(ii), Income Tax Regs.  The regulations define the term "employee" to include any person performing services in connection with which a fringe benefit is furnished, id., and define the term "employer" to include any provider of a fringe benefit in connection with payment for the performance of services, sec. 1.61-21(a)(5), Income Tax Regs.

In addition, the person to whom a fringe benefit is taxable is the person performing the services in connection with which the fringe benefit is furnished, regardless of whether that person is the person who actually receives the fringe benefit. Sec. 1.61-21(a)(4)(i), Income Tax Regs.  For example, if an employer provides an automobile to an employee's spouse in connection with the performance of services by the employee, that fringe benefit is taxable to the employee.  Id.  The automobile is considered to be available to the employee, and the use by the employee's spouse is considered to be use by the employee.  Id.

years at issue, they are entitled to exclude 50 percent of that value as a so-called working condition fringe under section 132(a)(3). That is because, according to petitioners, 50 percent of Mr. Whitehead's use of certain Burien Nissan automobiles during those years constituted a business use of those automobiles.

For purposes of section 132, the term "working condition fringe" means any property or services provided to an employee to the extent that, if the employee paid for such property or services, such payment would be allowable as a deduction under section 162 or section 167. Sec. 132(d). Section 162 generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Sec. 162(a). Section 167 allows a deduction for a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business or held for the production of income. Sec. 167(a). A particular payment otherwise allowable as a deduction under section 162 or section 167 is not allowable unless any applicable substantiation requirements of section 274 are satisfied. Sec. 1.132-5(a)(1)(ii), Income Tax Regs.

In the case of a taxpayer's use of an employer-provided vehicle, in order to exclude from gross income as a working condition fringe under section 132(a)(3) any portion of the fair

market value of that use a taxpayer must:  (1) Show that any payment for such use would be allowable as a deduction under section 162 or section 167 and (2) satisfy the substantiation requirements of section 274(d) and the regulations thereunder by adequate records (adequate records requirement) or by sufficient evidence corroborating their own statements (sufficient evidence requirement).  See sec. 274(d)(4); sec. 1.274-5T(c)(1), (e)(1)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017, 46026 (Nov. 6, 1985); sec. 1.132-5(a)(1)(ii), Income Tax Regs.[32]

In order to meet the adequate records requirement, a tax-payer must maintain an account book, diary, log, or similar record, made at or near the time of the expenditure or use, which

---

[32]Sec. 274(d) provides in pertinent part:

SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

(d) Substantiation Required.--No deduction or credit shall be allowed--

 *     *     *     *     *     *     *

(4) with respect to any listed property (as de-fined in section 280F(d)(4)),

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the * * * use of the facility or property * * *, (C) the business purpose of the expense or other item * * *.

The term "listed property" is defined in section 280F(d)(4) to include passenger automobiles.  Sec. 280F(d)(4)(A)(i).

includes a written statement of business purpose (unless such business purpose is evident from the surrounding facts and circumstances) and sufficient information as to each element of every business use.  Sec. 1.274-5T(c)(2)(i) and (ii), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

As pertinent here, section 1.274-5T(c)(3)(ii), Temporary Income Tax Regs., 50 Fed. Reg. 46021 (Nov. 6, 1985), entitled "Sampling", provides a method of substantiation that a taxpayer may use if the taxpayer does not maintain an adequate record within the meaning of section 274(d) and the regulations thereunder for the entire taxable year.  That section provides that generally a taxpayer may meet the sufficient evidence requirement under section 274(d) and the regulations thereunder by maintaining an adequate record for a portion or portions of a taxable year and using that record to substantiate the business use of listed property for all of that year.  However, the taxpayer must demonstrate by other evidence that the use for the portion or portions of the taxable year for which the adequate record is maintained is representative of the use for the taxable year (sampling method of substantiation).  Sec. 1.274-5T(c)(3)(ii)(A), Temporary Income Tax Regs., 50 Fed. Reg. 46021 (Nov. 6, 1985). The sampling method of substantiation may not be used to substantiate the business use of an employer-provided automobile that is made available for use by more than one employee for all or a

portion of a taxable year.  Sec. 1.274-5T(c)(3)(ii)(B), Temporary Income Tax Regs., 50 Fed. Reg. 46021 (Nov. 6, 1985).

Having set forth the pertinent law, we turn to whether, without regard to the requirements of section 274(d) and the regulations thereunder, petitioners have shown that any payment by them for Mr. Whitehead's use of certain Burien Nissan automobiles during the years at issue would be allowable as a deduction under section 162 or section 167.  Petitioners make no arguments or contentions with respect to that question.  On the record before us, we find that petitioners have failed to show that, without regard to the requirements of section 274(d) and the regulations thereunder, any such payment would be allowable as a deduction under either of those sections.

Assuming arguendo that petitioners had shown that, without regard to section 274(d) and the regulations thereunder, any payment by them for Mr. Whitehead's use of certain Burien Nissan automobiles during the years at issue would be allowable as a deduction under section 162 or section 167, see sec. 132(d), petitioners must nonetheless establish that they have satisfied the substantiation requirements of section 274(d) and the regulations thereunder.  Petitioners have attempted to meet those substantiation requirements through the sampling method of substantiation.  On the record before us, we find that petitioners have failed to show that they are entitled to use the sam-

pling method of substantiation. That is because, on the record before us, we find that petitioners have failed to show that the Burien Nissan automobiles that each of them used during each year at issue were not made available for use by more than one Burien Nissan employee for all or a portion of each such year. See sec. 1.274-5T(c)(3)(ii)(B), Temporary Income Tax Regs., 50 Fed. Reg. 46021 (Nov. 6, 1985).

Assuming arguendo that petitioners had shown (1) that, without regard to section 274(d) and the regulations thereunder, any payment by them for Mr. Whitehead's use of certain Burien Nissan automobiles would be allowable as a deduction under section 162 or section 167 and (2) that they are entitled to use the sampling method of substantiation, we must consider whether petitioners have met the requirements of that method. In support of petitioners' contention that 50 percent of Mr. Whitehead's use of certain Burien Nissan automobiles during the years at issue constituted a business use, petitioners rely on the purported mileage log that petitioners claim Mr. Whitehead maintained during January through March 1996 (test period). We have found that purported log to be questionable and not reliable.[33] In

_____

[33]Assuming arguendo that we had relied on the purported mileage log, on the record before us, we find that that purported log does not meet the adequate records requirement under sec. 1.274-5T(c)(2)(i) and (ii), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). We find on the record before us that the purported mileage log did not contain a written statement of
(continued...)

support of petitioners' contention that Mr. Whitehead's use of

certain Burien Nissan automobiles during the test period was

representative of Mr. Whitehead's use of those automobiles

throughout the years at issue, petitioners rely on Mr. White-

head's self-serving testimony.  Based on the Court's evaluation

of Mr. Whitehead's testimony, we are not required to, and we

shall not, rely on his testimony regarding his use of certain

Burien Nissan automobiles during the years at issue.  See Lerch

v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg.

T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-

690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159;

Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).[34]  On the record

before us, we find that petitioners have failed to meet the

requirements of the sampling method of substantiation.  On that

record, we further find that petitioners have failed otherwise to

---

[33](...continued)
the business purpose of any miles allegedly driven by Mr. White-
head during the test period.  We further find on that record that
petitioners have failed to show that the alleged business purpose
of any miles allegedly driven by Mr. Whitehead during the test
period is evident from the surrounding facts and circumstances.
In this connection, no credible evidence in the record estab-
lishes the facts and circumstances during the years at issue
surrounding Mr. Whitehead's claimed business uses of certain
Burien Nissan automobiles during those years.

[34]The principle that we are not required to rely on testi-
mony, even if uncontradicted, that we find to be, inter alia, not
credible, questionable, unreasonable, general, and/or vague is so
well established that hereinafter we shall not cite the case law
supporting that principle.

meet the substantiation requirements under section 274(d) and the regulations thereunder by introducing either adequate records or sufficient evidence corroborating Mr. Whitehead's own statements with respect to his business use of certain Burien Nissan automobiles during the years at issue.

On the record before us, we find that petitioners have failed to establish that any portion of Mr. Whitehead's use of certain Burien Nissan automobiles during the years at issue constituted a business use, the fair market value of which is excludable from gross income as a working condition fringe under section 132(a)(3).  We further find on that record that the entire fair market value of Mr. Whitehead's use of certain Burien Nissan automobiles during the years at issue is includible in petitioners' income for those years as wages to Mr. Whitehead.

Having so found, we turn now to the parties' dispute over the fair market value of Mr. Whitehead's use of certain Burien Nissan automobiles during the years at issue.  With respect to employer-provided automobiles, unless the taxpayer applies one of the special valuation rules set forth in section 1.61-21(d), (e), and (f), Income Tax Regs.,[35] the fair market value of an

---

[35]On brief, petitioners claim that they applied one of the special valuation rules, namely, the automobile lease valuation rule under sec. 1.61-21(d), Income Tax Regs., to calculate the value of petitioners' respective uses of certain Burien Nissan automobiles during the years at issue.  We are not convinced from the calculation that petitioners present on brief that they did
(continued...)

employer-provided automobile generally is equal to the amount that an individual would have to pay in an arm's-length transaction to lease the same or comparable automobile on the same or comparable conditions in the geographic area in which the automobile is available for use.  Sec. 1.61-21(b)(4)(i), Income Tax Regs.

On the record before us, we find that petitioners have failed to establish that the fair market value of Mr. Whitehead's use of certain Burien Nissan automobiles during the years at issue is equal to the value that they reported for such use in their joint return for each of those years.

### Petitioners' Position With Respect to Ms. Whitehead's Use of Certain Burien Nissan Automobiles During the Years at Issue

With respect to the parties' dispute as to whether any portion of petitioners' respective uses of certain Burien Nissan automobiles during the years at issue constituted a business use of such automobiles, petitioners appear to contend that only Mr. Whitehead, and not Ms. Whitehead, had any business use of certain Burien Nissan automobiles during those years.[36]  The parties'

---

[35](...continued)
in fact use that special valuation rule.  In any event, on the record before us, we find that petitioners have failed to show that they are entitled to use the automobile lease valuation rule to calculate the value of their respective uses of certain Burien Nissan automobiles during the years at issue.  See sec. 1.61-21(c)(2)(ii), Income Tax Regs.

[36]On brief, petitioners contend that they could have estab-
(continued...)

disputes with respect to Ms. Whitehead's use of certain Burien Nissan automobiles during the years at issue are whether: (1) Ms. Whitehead performed services for Burien Nissan during the years at issue for which she was compensated by her personal use of certain Burien Nissan automobiles during those years; (2) in the performance of such services, Ms. Whitehead worked at least 120 hours during each year at issue; and (3) for 1996, petitioners correctly reported the value of Ms. Whitehead's services in their joint return for that year as self-employment income in the amount of $6,600.[37]

---

[36](...continued)
lished through their testimony at trial that, at least during 1996, Ms. Whitehead "used her vehicle for business purposes and no adjustment was made for such use or for fuel purchased by petitioner[s] from personal funds." However, petitioners indicate on brief that they will adhere to the "conservative approach" that they claim they took in their joint return for each of the years at issue, in which they reported income from their respective claimed personal uses of certain Burien Nissan automobiles during those years. That "conservative approach" was based on the alleged business use of certain Burien Nissan automobiles by Mr. Whitehead only, and not by Ms. Whitehead.

Assuming arguendo that petitioners had not adhered to the "conservative approach" that they claim they took in their joint return for each of the years at issue and that petitioners are contending that any portion of Ms. Whitehead's use of certain Burien Nissan automobiles during the years at issue constituted a business use of such automobiles, on the record before us, we find that petitioners have failed to show that any portion of her use of such automobiles during those years constituted a business use of such automobiles.

[37]Petitioners allege as facts that, for each year at issue, Ms. Whitehead performed services for Burien Nissan, she was compensated for such services through her personal use of certain
(continued...)

With respect to the parties' dispute as to whether Ms. Whitehead performed services for Burien Nissan during the years at issue, petitioners contend that those services included "performing administrative tasks, functioning as corporate Secretary, assisting with the transporting of vehicles when sales promotions were conducted away from the dealership site and coordinating employee functions at two or more major events during the operating year."[38]  In support of petitioners' contention that Ms. Whitehead performed those services for Burien Nissan during the years at issue, petitioners rely on their self-serving testimony.  We are not required to, and we shall not, rely on Mr. Whitehead's testimony.  Based on the Court's evaluation of Ms. Whitehead's testimony, we are not required to, and we shall not, rely on her testimony to establish that she performed

[37](...continued)
Burien Nissan automobiles, and that use had a value of $6,600. Nevertheless, petitioners contend that that $6,600 constitutes self-employment income attributable to Ms. Whitehead for 1996 and to Mr. Whitehead for 1997.  It is not altogether clear why petitioners are claiming inconsistent treatment of the value of Ms. Whitehead's alleged services and use of certain Burien Nissan automobiles for each year at issue.  However, as discussed below, we believe that the reason for such inconsistent treatment is that, in order to be entitled to a deduction for the entire $2,000 contribution to her IRA for 1996, Ms. Whitehead would have to have received compensation for that year of at least $2,000. In contrast, due to a change in the law, she would not have to have received any compensation in order to be entitled to a deduction for the entire $2,000 contribution to her IRA for 1997.

[38]Petitioners concede that Ms. Whitehead did not have any written agreement with respect to any services that petitioners claim she performed for Burien Nissan during the years at issue.

services for Burien Nissan during the years at issue.  On the record before us, we find that petitioners have failed to show that Ms. Whitehead performed any services for Burien Nissan during the years at issue.[39]

Assuming arguendo that petitioners had shown that Ms. Whitehead performed any services for Burien Nissan during the years at issue, we find on the record before us that petitioners have failed to show that Burien Nissan intended to, or did in

---

[39]Ms. Whitehead testified at length about her involvement in planning and carrying out plans for two Burien Nissan employee functions (alleged employee functions) during each year at issue. We are not required to, and we shall not, rely on Ms. Whitehead's testimony.  Moreover, petitioners did not introduce into the record any credible corroborating evidence that establishes that such alleged functions took place and that Ms. Whitehead performed any services with respect to such alleged functions.  We infer from petitioners' failure to proffer any such credible corroborating evidence that any such evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioners' position with respect to the alleged services provided to Burien Nissan by Ms. Whitehead during the years at issue.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1164-1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  In this connection, we note that in Form 1120 that Burien Nissan filed for each of the years at issue it did not claim deductions in amounts large enough to cover the several thousand dollars that Ms. Whitehead testified it spent each year on the alleged employee functions.  Assuming arguendo that petitioners had established that Burien Nissan held the alleged employee functions during each year at issue and that Ms. Whitehead performed some services with respect to the planning and the carrying out of plans for such functions, on the record before us, we find that petitioners have failed to show that Burien Nissan intended to, or did in fact, compensate Ms. Whitehead for such services. In this connection, Ms. Whitehead could have performed some services for Burien Nissan relating to certain alleged employee functions gratuitously upon the request of her husband, who was its president and sole stockholder during the years at issue.

fact, compensate her for any such services.[40]

On the record before us, we find that petitioners have failed to show that Burien Nissan permitted Ms. Whitehead to use certain Burien Nissan automobiles in order to compensate her for any services that she performed and not to compensate Mr. White-head for the services that he performed for Burien Nissan. We find on that record that the fair market value of Ms. Whitehead's use of certain Burien Nissan automobiles during the years at issue constitutes a fringe benefit provided by Burien Nissan to Mr. Whitehead and is includible in petitioners' income for those years as wages to Mr. Whitehead. See sec. 1.61-21(a)(4)(i), Income Tax Regs. On the record before us, we further find that petitioners have failed to establish that the fair market value of Ms. Whitehead's use of certain Burien Nissan automobiles during the years at issue is equal to the value that they re-ported for such use in their joint return for each of those years.

Based on our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing error in the determinations of respondent to include in petitioners' taxable income for 1996 and 1997 the net amounts of $5,850 and $6,600, respectively, as a result of petitioners'

---

[40]As discussed supra note 39, Ms. Whitehead could have performed certain services for Burien Nissan gratuitously upon the request of her husband.

respective uses during those years of certain Burien Nissan automobiles.[41]  On that record, we sustain those determinations.

Petitioners' Claimed Deductions for
Certain Mortgage Interest and Property Taxes

Respondent determined to disallow any deductions for mortgage interest and property taxes claimed by petitioners for each year at issue in excess of the deductions claimed by them for each such year for mortgage interest and property taxes paid with respect to the Sumner property.[42]

The parties agree that the mortgage interest and property taxes at issue are attributable to the debt that Mr. Whitehead and Essie Whitehead incurred when they refinanced the Kirkland property in February 1994.  The parties' disputes are whether Mr. Whitehead paid any portion of the disallowed mortgage interest and property taxes and, if he did pay a portion of the mortgage interest at issue, whether that interest constitutes qualified

---

[41]We note that, when Mr. Stanford was president of Burien Nissan, his employment agreement provided that he was entitled to unrestricted access to two Burien Nissan automobiles for his personal use.  Mr. Whitehead could have received the same benefit when he became president of Burien Nissan.

[42]Respondent also determined to disallow the deduction for points not reported in Form 1098 that petitioners claimed with respect to the Kirkland property for each year at issue.  Petitioners make no argument on brief with respect to their entitlement to the deduction that they claimed for each year at issue for those points.  We conclude that petitioners have abandoned contesting respondent's determinations disallowing the deductions claimed for those points.  See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

residence interest under section 163(h)(3).  Before turning to the contentions of the parties, we shall summarize the pertinent law.

Section 163(a) generally allows a deduction for all interest paid or accrued during the taxable year on indebtedness.  In the case of a taxpayer other than a corporation, section 163(h) generally disallows any deduction for "personal interest".  The term "personal interest" is defined to mean any interest allowable as a deduction under chapter 1 of the Code other than, inter alia, any qualified residence interest.  Sec. 163(h)(2)(D).  The term "qualified residence interest" means any interest which is paid or accrued during the taxable year on, inter alia, acquisition indebtedness.  Sec. 163(h)(3)(A).  The term "acquisition indebtedness" is defined to mean any indebtedness which is incurred in acquiring, constructing, or substantially improving any qualified residence of the taxpayer and which is secured by such residence.  Sec. 163(h)(3)(B)(i).  The term "acquisition indebtedness" also includes any indebtedness secured by any qualified residence of the taxpayer resulting from the refinancing of acquisition indebtedness, but only to the extent that the amount of the indebtedness resulting from such refinancing does not exceed the amount of the refinanced indebtedness.  Id.

Section 164 allows a deduction for certain taxes, including real property taxes, paid or accrued during the taxable year.

Sec. 164(a)(1).

In the case of a mortgage loan for which the taxpayer is jointly liable with another person, a deduction for mortgage interest and property taxes is allowable to the persons or person who pays such interest and taxes out of his or her own funds in proportion to such payment. See Higgins v. Commissioner, 16 T.C. 140, 142-144 (1951); Jolson v. Commissioner, 3 T.C. 1184, 1186-1187 (1944).[43]

It is petitioners' position that they are entitled to a deduction for each year at issue in the amount of $7,200 for mortgage interest and property taxes paid by Mr. Whitehead with respect to the Kirkland property.[44] That is because, according to petitioners, during each of those years Mr. Whitehead paid

---

[43]See also Blackburn v. Commissioner, T.C. Memo. 1979-266, affd. per curiam 681 F.2d 461 (6th Cir. 1982).

[44]Petitioners claimed in their joint return for 1996 and 1997 deductions for mortgage interest and property taxes in excess of the amounts paid for those years with respect to the Sumner property. The respective amounts claimed as deductions in their returns that did not pertain to the Sumner property were $9,772.46 and $9,691. Respondent disallowed those respective amounts of deductions for those years. Petitioners claim on brief that they are entitled to only $7,200 of those disallowed amounts for mortgage interest and property taxes for each year at issue. We conclude that, of the total mortgage interest and property tax deduction disallowed by respondent for each year at issue, petitioners have abandoned claiming that they are entitled for each such year to a deduction for mortgage interest and property taxes in excess of $7,200. See Rybak v. Commissioner, supra.

Essie Whitehead $600 per month,[45] and Essie Whitehead used those payments, along with her own funds, to make the monthly mortgage loan payment (which included payment of mortgage interest and property taxes) on the Kirkland property. (Hereinafter, all references to the monthly mortgage loan payment on the Kirkland property includes payment of mortgage interest and property taxes.)

To support their position, petitioners rely on Mr. Whitehead's self-serving testimony and the testimony of his mother, Essie Whitehead. We are not required to, and we shall not, rely on Mr. Whitehead's testimony. As for the testimony of Essie Whitehead, at trial she indicated that at least during the years at issue Mr. Whitehead and she had a general arrangement between them (purported general arrangement) pursuant to which Mr. Whitehead was to, and did in fact, contribute $600 per month toward the monthly mortgage loan payment on the Kirkland property. The parties stipulated, and we have found, that Mr. Whitehead did not in fact pay Essie Whitehead $600 every month

---

[45]The parties stipulated that Mr. Whitehead paid Essie Whitehead a total of $6,600 for 1996 and $6,622 for 1997. On the record before us, we find that petitioners have failed to show that Mr. Whitehead paid Essie Whitehead any amount greater than those stipulated amounts. On that record, we reject petitioners' claim that Mr. Whitehead paid Essie Whitehead $600 per month, or a total of $7,200, during each year at issue.

during the years at issue.[46]  The record belies Essie Whitehead's testimony that she had the purported general arrangement with Mr. Whitehead during the years at issue that she described and that Mr. Whitehead acted in accordance with any such purported general arrangement.

On the record before us, we find that petitioners have failed to show that Mr. Whitehead paid funds to Essie Whitehead during the years at issue subject to the requirement that she use those funds solely to make the monthly mortgage payment on the Kirkland property and not for any use she desired.  On that record, we further find that petitioners have failed to show that Essie Whitehead used any portion of the amounts that Mr. Whitehead paid to her during the years at issue to make the monthly mortgage loan payment on the Kirkland property.[47]

Based on our examination of the entire record before us, we find that petitioners have failed to establish that they are entitled to a deduction for each year at issue for any mortgage interest and property taxes relating to the Kirkland property.

Petitioners' Claimed IRA Deduction

Respondent determined to disallow the deduction that peti-

---

[46]Mr. Whitehead made no payments to Essie Whitehead in January 1996, May 1997, June 1997, and November 1997.

[47]In light of our findings, we shall not address respondent's contention with respect to whether the mortgage interest at issue constitutes qualified residence interest under sec. 163(h)(3).

tioners claimed in their 1996 joint return for the $2,000 contri-
bution made to Ms. Whitehead's IRA during that year.  Respondent
made that determination because respondent determined that Ms.
Whitehead did not receive any compensation during 1996.  On
brief, respondent concedes that, pursuant to section 219(c) as in
effect for petitioners' tax year 1996, petitioners are entitled
to a deduction of $250 with respect to contributions of $2,000
that were made to Ms. Whitehead's IRA during that year.

It is petitioners' position that they are entitled to a
deduction for 1996 for contributions made to Ms. Whitehead's IRA
in the amount that they claimed in their joint return for that
year, i.e., $2,000.  In support of their position, petitioners
contend, as they do with respect to the respective values of
petitioners' respective uses of certain Burien Nissan automobiles
during the years at issue, that Ms. Whitehead performed at least
120 hours of services for Burien Nissan during 1996 for which
Burien Nissan compensated her by permitting her to use certain
Burien Nissan automobiles, the value of which was $6,600.[48]

Section 219 generally allows a deduction for contributions

---

[48]On brief, petitioners also contend that, valuing at $17
per hour the 120 hours of services that they contend Ms. White-
head performed for Burien Nissan during 1996, her compensation
for those services would have been $2,040, which is an amount
substantially less than the value ($6,600) that petitioners
claimed in their 1996 joint return.  Assuming arguendo that Ms.
Whitehead had worked 120 hours for Burien Nissan during 1996, the
value of her services would have to have been $55 per hour in
order for her to have received compensation of $6,600.

by or on behalf of individuals during the taxable year to, inter
alia, an IRA. Sec. 219(a), (e); sec. 1.219-1(a), Income Tax
Regs. Such a deduction is limited to the lesser of $2,000 or the
amount of compensation includible in such individual's gross
income for such taxable year. Sec. 219(b)(1). As pertinent
here, under section 219(c) as in effect for petitioners' taxable
year 1996, in the case of married couples filing jointly where
one spouse receives compensation and the other spouse (non-
receiving spouse) does not, the amount allowable as a deduction
for contributions to the nonreceiving spouse's IRA shall not
exceed $250.[49]

We have found that petitioners failed to show that Ms.
Whitehead performed any services for Burien Nissan during 1996
for which Burien Nissan intended to, or did in fact, compensate

---

[49]As pertinent here, under sec. 219(c) as in effect for
petitioners' taxable year 1997, in the case of married couples
filing jointly where one spouse (lesser-receiving spouse) re-
ceives less compensation than the other spouse, the amount
allowable as a deduction for contributions to the lesser-receiv-
ing spouse's IRA shall not exceed $2,000. See Small Business Job
Protection Act of 1996, Pub. L. 104-188, sec. 1427(a), 110 Stat.
1802. Under sec. 219(c) as in effect for petitioners' taxable
year 1997, petitioners are entitled to deduct the $2,000 contrib-
uted to Ms. Whitehead's IRA regardless of whether she received
any compensation during that year. We believe that the provi-
sions of sec. 219(c) as in effect for each of petitioners'
taxable years 1996 and 1997 prompted petitioners to attribute to
Ms. Whitehead the claimed $6,600 of self-employment income that
they reported in their 1996 joint return and, inconsistently, to
attribute to Mr. Whitehead the claimed $6,600 of self-employment
income that they reported in their 1997 joint return. See supra
note 37.

her, let alone at the hourly rate of $17 or $55, see discussion supra note 48. On the record before us, we further find that petitioners have failed to show that Ms. Whitehead received any compensation from Burien Nissan during 1996, let alone the $6,600 of compensation that they reported for that year.

Based on our examination of the entire record before us, we find that petitioners have failed to establish that they are entitled to a deduction for 1996 for contributions made to Ms. Whitehead's IRA for that year in excess of the $250 conceded by respondent.

## Excise Tax Under Section 4973(a)

Respondent determined that petitioners are liable for each year at issue for an excise tax of $120 under section 4973(a). On brief, respondent concedes a portion of that amount and contends that petitioners are liable for each year at issue for an excise tax of $105 under section 4973(a).[50]

Section 4973(a) imposes an excise tax in an amount equal to 6 percent of the excess contributions to, inter alia, an IRA. Sec. 4973(a)(1). As pertinent here, the term "excess contributions" is defined to mean (1) the excess of the amount contributed for the taxable year to the IRA over the amount allowable as

---

[50]Respondent's concession with respect to petitioners' liability for each year at issue for the excise tax under sec. 4973(a) is as a result of respondent's concession that petitioners are entitled to a deduction of $250 for 1996 with respect to the contributions made to Ms. Whitehead's IRA.

a deduction under section 219 for such contributions, sec. 4973(b)(1), and (2) the amount determined under section 4973(b) for the preceding taxable year, sec. 4973(b)(2). The individual to whose IRA the excess contributions are made is liable for the excise tax under section 4973(a). Sec. 4973(a).

Petitioners contributed $2,000 to Ms. Whitehead's IRA during 1996. We have found that petitioners failed to establish that they are entitled under section 219 to a deduction for 1996 in excess of the $250 conceded by respondent. We find on the instant record that the excess contributions under section 4973(b) to Ms. Whitehead's IRA for 1996 are $1,750 (i.e., the excess of the $2,000 contributed to Ms. Whitehead's IRA over the $250 conceded by respondent). We further find on that record that the excess contributions under section 4973(b) to Ms. Whitehead's IRA for 1997 are $1,750 (i.e., the amount determined under section 4973(b) for 1996).

Based on our examination of the entire record before us, we find that Ms. Whitehead is liable for each year at issue for an excise tax of $105 under section 4973(a).[51]

---

[51]In the notice, respondent imposed the excise tax under sec. 4973(a) on petitioners. It is not clear under sec. 4973(a) that Mr. Whitehead is liable for such tax. Any question as to his liability is to be resolved in the proceedings in this case under Rule 155. See sec. 4973(a) (last sentence); Johnson v. Commissioner, 74 T.C. 1057, 1062 (1980), affd. 661 F.2d 53 (5th Cir. 1981); Guest v. Commissioner, 72 T.C. 768, 779-780 (1979).

Accuracy-Related Penalty Under Section 6662(a)

Respondent determined that petitioners are liable for each year at issue for the accuracy-related penalty under section 6662(a) because of: (1) A substantial understatement of income tax under section 6662(b)(2) and (2) alternatively, negligence under section 6662(b)(1).

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment of tax resulting from, inter alia, a substantial understatement of income tax, sec. 6662(b)(2), or negligence or disregard of rules or regulations, sec. 6662(b)(1). For purposes of section 6662(a), an understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in the tax return, sec. 6662(d)(2)(A), and is substantial in the case of an individual if it exceeds the greater of 10 percent of the tax required to be shown or $5,000, sec. 6662(d)(1)(A). For purposes of section 6662(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the Code, and the term "disre-gard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Negligence has also been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of a professional, such as an accountant, does not necessarily demonstrate reasonable cause and good faith unless, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Id. In the case of claimed reliance on the accountant who prepared the taxpayer's tax return, the taxpayer must establish that correct information was provided to the accountant and that the item incorrectly omitted, claimed, or reported in the return was the result of the accountant's error. Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

On brief, petitioners contend that they had a reasonable basis for the positions that they took in their joint return for each of the years at issue, that they did not intentionally disregard any Code provisions in preparing each such return, that respondent determined to impose the accuracy-related penalty in

order "to intimidate the taxpayers from properly asserting their positions with regard to their tax liability", and that the issues remaining for decision in this case "represent a legitimate difference of opinion at worst and thus do not provide a basis for the negligence penalty".

Except for their conclusory statements on brief, petitioners point to no facts and advance no arguments in support of their contentions that (1) they had a reasonable basis for the positions that they took in their joint return for each of the years at issue, (2) they did not intentionally disregard any Code provisions in preparing each such return, (3) respondent determined to impose the accuracy-related penalty under section 6662(a) in order to intimidate petitioners, and (4) the issues remaining for decision in this case merely represent legitimate, substantive differences of opinion between petitioners and respondent.[52]

On the record before us, we find that, in the event the computations under Rule 155 establish that there is an under-

---

[52]Although not altogether clear, petitioners may be claiming reliance on the accountant who prepared their joint return for each of the years at issue to support certain of their contentions with respect to the accuracy-related penalty under sec. 6662(a). On the record before us, we find that petitioners have failed to show (1) that any such reliance was reasonable and that they acted in good faith, see sec. 1.6664-4(b)(1), Income Tax Regs., and (2) that they provided correct information to that accountant and that any item incorrectly omitted, claimed, or reported in those joint returns was the result of that accountant's error, see Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

statement of tax for each year at issue as a result of our holdings in this case that exceeds the greater of 10 percent of the tax required to be shown in petitioners' joint return for each such year or $5,000, see sec. 6662(d)(1)(A), petitioners have failed to show that there is no substantial understatement of tax under section 6662(b)(2) and (d). On that record, we further find that petitioners have failed to show that they were not negligent and did not disregard rules or regulations within the meaning of section 6662(b)(1), or otherwise did what a reasonable person would do, with respect to any portion of the underpayment for each year at issue. On the record before us, we also find that petitioners have failed to show that they acted with reasonable cause and in good faith with respect to any portion of the underpayment for each such year. See sec. 6664(c).

Based on our examination of the entire record before us, we find that petitioners have failed to establish error in respondent's determinations that they are liable for each year at issue for the accuracy-related penalty under section 6662(a).

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit and/or irrelevant.

To reflect the foregoing, the concessions of respondent, and the matters abandoned by petitioners,

Decision will be entered under

Rule 155.